Filed 9/29/20  P. v. Brokken CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072112 |
| v. | (Super.Ct.No. INF1200295) |
| JASON WILLIAM BROKKEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Russell L. Moore, Judge. Affirmed.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jason William Brokken of second degree murder and found that he personally used a dangerous or deadly weapon in the commission of the offense.

(Pen. Code, §§ 187, subd. (a), 12022, subd. (b); unlabeled statutory references are to this code.)  In a bifurcated proceeding, the trial court found that Brokken suffered one prior strike conviction and served three prior prison terms.  (§§ 667, subds. (c) & (e), former 667.5, subd. (b), 1170.12, subd. (c)(1).)  The trial court struck the three prior prison term enhancements but not the prior strike.  Brokken was sentenced to 31 years to life in state prison.

On appeal, Brokken argues that (1) the trial court prejudicially erred by giving the jury an instruction on involuntary intoxication that purportedly lessened the prosecutor's burden of proof, (2) the trial court abused its discretion by refusing to strike his prior strike conviction, and (3) his prior prison term enhancements should be reversed.  We vacate the true findings on the prior prison term enhancements but otherwise affirm.

BACKGROUND

A.  *Discovery of the Body*

On January 22, 2012, a horseback rider discovered a dead body in the desert off a dirt road near her home.  Law enforcement responded to the scene.  The body was identified as belonging to 74-year-old Kenneth M.[1]  Two plastic bags covered most of the body.  Numerous personal belongings were strewn around the body, including bedding, computer towers, and a phone bill with Kenneth's residential address.

---

[1]  We refer to the victim and witness by their first names, with or without last initials, to preserve their anonymity.  (Cal. Rules of Court, rule 8.90(b).)  No disrespect is intended.

B. *Forensic Pathologist*

Kenneth suffered eight incised wounds on his head with associated fractures to his skull. A couple of those wounds were located on the back of Kenneth's head. Something with an edge, such as an axe or a hatchet, caused the incised wounds. In addition to those injuries, Kenneth suffered one laceration on the top of his skull, which was caused by blunt impact. He also had three abrasions on his face. Kenneth did not have any defensive wounds. The sharp and blunt injuries to the head caused Kenneth's death.

C. *Investigation*

Detectives from the Riverside County Sheriff's Department went to Kenneth's residence on the night that the body was discovered. No one answered the front door, so the detectives entered the mobile home through an open bedroom door. One of the detectives noticed bloodstains, that the bed did not have a comforter, and an odor from a cleaning agent. The detectives verbally announced their presence. Brokken and another person, Cari J., emerged from another part of the residence, and the detectives informed them that they were investigating a homicide.

Brokken and Cari were then interviewed separately. Brokken did not appear to be under the influence. Brokken told a detective that he owned a vehicle but that it was located in another city. Cari said that Brokken's vehicle was parked at a nearby mobile home. Brokken and Cari were then taken to the sheriff's station.

During an interview of Brokken at the sheriff's station that day, Brokken explained that he had recently met Kenneth. Brokken thought that Kenneth had gone to Laughlin, Nevada. The investigator explained to Brokken that Brokken was a suspect in

3

Kenneth's murder, to which Brokken responded, "'I had no problem with [Kenneth].'"

Brokken did not respond when told that there was evidence implicating him in the killing.

In 2014, Brokken voluntarily made a statement to the prosecutor's office and denied

killing Kenneth.  Brokken identified someone else as possibly being the killer.

Deputies searched Kenneth's mobile home.  There was blood in the master

bedroom on, around, and underneath a desk and an accompanying chair.  There was also

a piece of human bone on the chair.  There were no signs of a physical altercation

occurring in Kenneth's bathroom.  No weapons, illegal narcotics, or ketamine were found

at the residence.

D.  *Testimony of Kenneth's Live-in Guest*

In January 2012, Cari was living in the laundry room of Kenneth's mobile home.

She became acquainted with Kenneth through a friendship with his roommate.

Kenneth's roommate also introduced Cari to Brokken.

On January 21, 2012, Brokken came to Kenneth's mobile home at approximately

8:00 a.m. and asked Cari if he could shower there because there was no hot water where

he was staying.  Kenneth told Brokken that he could use the shower in Kenneth's

bathroom.  Brokken went into Kenneth's bedroom, where Kenneth was already located,

and shut the door behind him.  Cari did not see Brokken exit Kenneth's bedroom.  She

was in her room.  Kenneth had another roommate who was not home, having been

arrested the night before.

That afternoon, at approximately 1:00 p.m., Cari saw Brokken enter Kenneth's

residence again.  Brokken was heading toward Kenneth's room and was holding one arm

4

behind his back. Cari could see that Brokken was holding a hatchet or an axe behind his back. She thought that it was "odd" but did not ask Brokken what he was doing with the hatchet. Cari entered the laundry room and did not see Brokken go into Kenneth's room. At some point in the day (Cari could not recall whether it was before or after she saw Brokken with the hatchet), Brokken asked her for towels, which Cari thought was an odd request because there were a lot of towels in Kenneth's room. Cari could not recall whether she saw Brokken in Kenneth's house again that afternoon.

Later that afternoon at approximately 3:00 p.m., Brokken picked Cari up in his van to give her a ride. She noticed a strong chemical smell in the van that nearly caused her to fall out of the vehicle "because [her] eyes burned so bad."

E. *Brokken's Defense*

Brokken testified on his own behalf and admitted to killing Kenneth. He claimed to be in fear for his own life. Brokken admitted that he had a history of issues with alcohol and drugs (mainly methamphetamine) but claimed to have been sober since 2010.

Brokken first met Kenneth on January 11, 2012, when Brokken was visiting Cari. Brokken had recently started temporarily living with another friend who lived in the same mobile home park as Kenneth. For the following week and one-half, Brokken assisted Kenneth with various chores and errands.

On January 20, 2012, Brokken stayed overnight with Cari at Kenneth's home and stayed there for part of the next day. Sometime around 4:00 p.m. that following day, Kenneth asked if he could speak with Brokken. Brokken followed Kenneth into his bedroom. When Brokken entered the bedroom, Kenneth handed Brokken a cup of

5

coffee, which Brokken drank. Kenneth asked Brokken to move in and made unspecified verbal advances toward Brokken. Brokken estimated that he and Kenneth spoke for less than 10 minutes.

Brokken's next memory was "[coming] to" naked in a shower, at which point he had a brief "moment of consciousness and awareness." Brokken felt lethargic and weak. Kenneth was present with him and was also naked. Kenneth entered the shower and attempted to turn Brokken around, but Brokken could not recall what happened next. Brokken recalled exiting the shower, but he could not recall when he or Kenneth exited.

Brokken's next memory was of himself standing naked in Kenneth's bedroom, searching for clothes. Brokken wanted to leave. Kenneth was naked and standing next to Brokken and made some reference to "'Special K.'" Brokken then noticed that Kenneth was approaching Brokken with "some kind of cylindrical tube," which Brokken later learned was a "penis pump." At that point, Brokken realized Kenneth had a "black leather strap around his genitals." Brokken did not recall what happened in Kenneth's home after that.

Brokken's next memory was of "coming to" on the couch of the person with whom Brokken was staying, who lived two mobile homes away from Kenneth. Brokken was confused and having a difficult time "processing what was going on" and was "in and out of awareness." Brokken did not know how much time had passed since he entered Kenneth's room at approximately 4:00 p.m., but it was not dark outside when Brokken awoke. The only memories Brokken had were of searching for his clothes and being in the shower with Kenneth. Brokken immediately went to Kenneth's to "find out

6

what happened." On the way, Brokken picked up a small wooden hatchet from his friend's yard and placed the hatchet in his waistband so that his shirt concealed it. Brokken grabbed the hatchet in case he needed to defend himself.

Brokken could not recall whether Cari answered the door at Kenneth's residence, nor could he recall exactly what happened before he entered Kenneth's bedroom. In the bedroom, Brokken confronted Kenneth, explained that he knew something had happened but could not recall the specific details, and asked Kenneth, "'What did you do to me?'" Kenneth did not answer Brokken's question and instead informed Brokken that he could move into Kenneth's residence.

Brokken threatened to call the police because he knew that Kenneth had drugged him. Kenneth said the police would not believe Brokken and threatened to expose a video recording Kenneth had made of the two men earlier that night. Brokken demanded that Kenneth give him the recording. After Brokken threatened to call the police again, Kenneth acquiesced and went into the bathroom to retrieve the video. Brokken could not see Kenneth while he was in the bathroom but could hear Kenneth opening and closing drawers.

When Kenneth exited the bathroom, he was holding a knife in his right hand. Kenneth suddenly approached Brokken, screaming "'You'll never get the video.'" Brokken reacted without thinking and "pulled out the hatchet and swung as hard as [he] could." Brokken struck Kenneth "several more times." The only other strike he distinctly remembered was one that occurred while Kenneth was falling.

Brokken explained that he had lied to law enforcement and denied killing Kenneth because he did not want anyone in his family or the rest of the world to know what transpired between himself and Kenneth.

A biochemist testified on Brokken's behalf about the anesthetic, dissociative, and hallucinogenic properties of the drug ketamine. Ketamine is among the class of drugs that is "considered a date rape drug."

DISCUSSION

A. *Alleged Instructional Error*

On the defense of involuntary intoxication, the trial court instructed the jury with a modified version of CALCRIM No. 625. As given, the instruction provided: "You may consider evidence, if any, of the defendant's involuntary intoxication in reaching your verdict. You may consider that evidence in deciding whether the defendant acted with express or implied malice, or the defendant acted with deliberation and premeditation, or the defendant acted in lawful self-defense, or the defendant acted in imperfect self-defense, or the defendant acted in the heat of passion. [¶] A person is involuntarily intoxicated if he unknowingly ingested some intoxicating liquor, drug or other substance, or if his intoxication is caused by t[h]e force, duress, fraud, trickery of someone else, for whatever purpose, without any fault on the part of the intoxicated person." The paragraph defining involuntary intoxication was taken from CALCRIM No. 3427. Brokken did not object to the instruction or request any modification of the language. The court instructed the jury on first and second degree murder and voluntary and involuntary manslaughter.

8

Brokken claims that the involuntary intoxication instruction lightened the prosecutor's burden of proof and consequently denied him the right "to present relevant evidence, to present a defense, and to a jury determination on all issues." He argues that the instruction's use of the permissive word "may" suggested to the jury that it could ignore the intoxication evidence altogether. He maintains that the jury instead should have been instructed that it was mandatory to consider all of the evidence regarding involuntary intoxication, as he purports the standard involuntary intoxication instruction, CALCRIM No. 3427 does.[2] The argument lacks merit.

In analyzing whether a jury instruction is ambiguous, "the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Mayfield* (1997) 14 Cal.4th 668, 777 (*Mayfield*), abrogated on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) "When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge." (*Mayfield*, *supra*, at p. 777.)

There is no reasonable likelihood that the jurors understood the involuntary intoxication instruction as permitting them to ignore the evidence of involuntary intoxication. Nothing in the language of the instruction itself suggests that the jury could disregard evidence of involuntary intoxication. (*People v. Lucas* (2014) 60 Cal.4th 153, 291 (*Lucas*), overruled on another ground in *People v. Romero And Self* (2015) 62

---

[2]    In addition to defining involuntary intoxication, CALCRIM No. 3427 provides: "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted."

Cal.4th 1, 53, fn. 19.)  Rather, the instruction detailed *how* the jury could consider evidence of Brokken's involuntary intoxication, if it concluded that such evidence existed.  (*Lucas*, *supra*, at p. 291.)  Thus, the instruction clarified how the involuntary intoxication evidence could be relevant to determining whether Brokken formed the required intent.  "It is pure speculation to believe the jury ignored certain evidence simply because an instruction advised the jury that it 'should' or 'may' consider that evidence, instead of commanding the jury to consider that evidence."  (*Ibid.*)

Moreover, in addition to receiving the challenged instruction, the jury also was instructed that "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you *must* impartially compare and *consider all the evidence* that was received throughout the entire trial."  (Italics added.)  (CALCRIM No. 220.)  Other instructions repeated the admonition that the jury must review and consider "all the evidence."  (CALCRIM Nos. 223 ["You must decide whether a fact in issue has been proved based on all the evidence"], 301 ["Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence"].)  We presume the jury followed those instructions.  (*People v. Daveggio And Michaud* (2018) 4 Cal.5th 790, 821.)

Taken as a whole, the instructions made clear that the jury should consider the involuntary intoxication evidence but only for those specified purposes set forth in the involuntary intoxication instruction.  There consequently was no reasonable likelihood that the jurors were misled by the modified instruction on involuntary intoxication into

10

understanding that it was free to ignore the evidence of involuntary intoxication.[3] We therefore conclude that the trial court did not err by instructing the jury as it did on involuntary intoxication.

B. *Denial of Brokken's* Romero *Motion*

Brokken contends that the trial court abused its discretion by denying his motion to strike his prior strike conviction under section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). We do not agree.

A trial court may, "in furtherance of justice," strike a prior conviction under the Three Strikes law. (§ 1385, subd. (a); *Romero, supra*, 13 Cal.4th at pp. 529-530.) In considering whether to strike a prior strike conviction, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) We review the trial court's decision for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)

---

[3] Brokken relies on *People v. Stevenson* (1978) 79 Cal.App.3d 976, 987 (*Stevenson*) for the proposition that the trial court was required to instruct jurors that it "must" consider all the evidence of involuntary intoxication. *Stevenson* did not purport to state a general rule about the inadequacy of an intoxication instruction using permissive language.

"""[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.""" (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.) In addition, "a "'decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'""" (*Id.* at p. 377.) "Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*)

Before and after the trial, Brokken moved to strike his prior strike, which was a 1986 burglary conviction. The trial court denied both requests.

We cannot say that the trial court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.) It is apparent from the trial judge's comments in denying the *Romero* motion that the trial court considered all the relevant factors, including the nature and circumstances of Brokken's past and present offenses and his background, character, and prospects. The trial judge "tried to find a substantial reason to strike the strike" based on the strike's remoteness and the factors favorable to Brokken, including Brokken's family support, Brokken's behaving as a "consummate gentleman in the court," and his future prospects in life. The trial court also acknowledged the quality of Brokken's upbringing.

Nevertheless, the court refused to strike the prior strike because of Brokken's postoffense conduct in attempting to avoid detection and lying to the police, and Brokken's extensive (though nonviolent) criminal history. Brokken's first conviction was the burglary conviction in 1986. Brokken thereafter violated probation numerous times and consequently spent time in jail and prison. After being released from prison in 1989, Brokken was not convicted again until 1997. From 1997 through 2011, however, Brokken suffered nine additional convictions in state court, mostly for drug offenses and property offenses, and one federal conviction for aiding and abetting illegal entry into the United States. Brokken was sentenced to prison two additional times, once in 2004 and once in 2006. Commenting on that criminal history, the court explained that after the strike conviction Brokken suffered "one conviction after another with some periods without convictions, understood, and I appreciate that they are not convictions of violence, but they are convictions that have been accompanied by prison sentences and parole violations."

Brokken attacks the trial court's decision on two grounds—the trial court's purported failure to consider his drug addiction as it related to his criminal history and the remoteness of his prior strike conviction. Neither challenge has merit.

Brokken first argues that the trial court abused its discretion by failing to consider the role of drug addiction in the current and past offenses committed by Brokken. As to the purported role of drug addiction in the present offense, Brokken does not point to any specific facts about how Brokken's drug addiction played any role in his killing of Kenneth. At sentencing, Brokken did not argue that his drug addiction was a factor in the

13

killing. On the contrary, in his *Romero* motion, Brokken asked the trial court to consider as a mitigating factor in his favor that many years before the present offense he had "voluntarily sought and received treatment" for his drug addiction. Moreover, the argument concerning drug addiction contradicts Brokken's theory of the case. Brokken claims that he *involuntarily* ingested a drug before killing Kenneth. Thus, because there is no evidence that Brokken's drug addiction played a role in the present offense, it follows that the trial court did not abuse its discretion by failing to consider such nonexistent evidence.

In any event, in denying the *Romero* motion, the trial court indicated that it was aware that Brokken had "struggled with substance abuse." The trial court therefore considered Brokken's drug addiction but was not persuaded that it should mitigate any of Brokken's past criminal conduct or should warrant striking the prior conviction. We cannot say that refusing to strike the prior conviction on that basis was irrational or arbitrary, so the trial court's conclusion consequently did not amount to an abuse of discretion.

Brokken's second argument, that the trial court abused its discretion by failing to consider the remoteness of the strike, fares no better. The trial court noted that the burglary conviction was "extremely old" but determined that the remoteness of the conviction did not warrant striking it, given the number of intervening convictions between the strike and the present offense. The remoteness in time of a prior strike is a proper consideration in deciding whether it should be stricken. (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) But it was not an abuse of discretion to refuse to strike

14

the prior strike on that basis here given that Brokken "led a continuous life of crime after the prior."**4** (*Ibid.*)

For all of these reasons, we conclude that the trial court did not abuse its discretion by denying Brokken's *Romero* motion.

## C. *Prison Prior Allegations*

Effective January 1, 2020, while this appeal was pending, Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1) amended section 667.5, subdivision (b), to restrict the circumstances under which a one-year sentence enhancement may be imposed for a prior prison term. Section 667.5, subdivision (b), now allows for the imposition of a one-year prior prison term enhancement only if the prior prison term was served for a sexually violent offense. Here, the trial court found true the allegations of three one-year prior prison term enhancements, but the underlying convictions were not sexually violent offenses. The trial court struck those convictions for purposes of sentencing. The parties agree and this court has already held that Senate Bill No. 136 applies retroactively to those like Brokken whose sentences were not final at the time that Senate Bill No. 136 became effective. (*People v. Chubbuck* (2019) 43 Cal.App.5th 1, 13-14.) We therefore vacate the true findings on the three prior prison term enhancement allegations.

---

**4** Given the trial court's thorough analysis of whether to strike the burglary conviction, we reject Brokken's suggestion that his due process rights were violated by the "trial court's refusal to exercise its discretion and adoption of a mechanized sentencing process." The trial court's decision was based on an individualized analysis of the facts and evidence presented.

DISPOSITION

The true findings on the three one-year prior prison term enhancement allegations under section 667.5, subdivision (b), are vacated.  The trial court is directed to amend the abstract of judgment accordingly and to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ          

J.

We concur:

CODRINGTON       

Acting P. J.

RAPHAEL           

J.